## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Old National Bank, successor-by-merger to First Midwest Bank<br><br>Plaintiff,<br><br>v .<br><br>Backbase Services USA, Inc., and Backbase U.S.A., Inc.<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Old National Bank ("Old National") successor-by-merger[1] to First Midwest Bank ("First Midwest"), by its undersigned attorneys complains against defendants, Backbase Services USA, Inc., and Backbase U.S.A, Inc. (collectively, "Backbase" or "Defendants"), as follows:

### NATURE OF ACTION

1.     This action arises from Backbase's scheme to defraud First Midwest to obtain contracts in excess of eighteen million dollars to upgrade and replace First Midwest's legacy banking computer systems by, among other things, making false representations that the Backbase Software contained out-of-the-box functionality when it did not, and "demonstrating" software that did not exist – all the while falsely promising that what it was showing First Midwest was real software, on real servers, and in production.  In addition to fraudulently inducing First Midwest to execute the contracts[2], Backbase thereafter breached them by providing First Midwest, and

---

[1] On February 16, 2022, First Midwest and its respective subsidiaries completed a merger of equals whereby they merged into Old National (The "Merger"). Old National is the successor entity after the Merger.  As a result of the Merger, *inter alia*, Old National succeeded to First Midwest's interest in the contracts that are the subject matter of this Complaint.

[2] Backbase and First Midwest entered into the Agreement (as that term is defined below) whereby Backbase agreed to implement and install certain Backbase software for First Midwest, (the "Backbase Software") and provide related software, support and implementation services in connection with the replacement of the Bank's legacy software systems (the "Project").

subsequently Old National, with inexperienced consultants that lacked financial institutional experience and who designed and attempted to implement a defective and non-regulatory compliant software system that caused, and continues to cause, serious damage to Old National's business.  Backbase then perpetuated its fraud by providing First Midwest and Old National with a series of inaccurate project status updates and inaccurate and misleading software demonstrations. All the while, Backbase promised that it could cure any defects in the software, including those resulting from Old National's User Acceptance Testing, if First Midwest would just have more patience, time, and above all, money to pay Backbase's fees.  Backbase thereby convinced First Midwest to sign additional Statements of Work for a defective and non-compliant software solution that Backbase knew it could never deliver.

## THE PARTIES

2.     Plaintiff Old National is a national banking association that maintains its primary headquarters at One Main St., Evansville, Indiana 47708 and additional headquarters at 8750 W Bryn Mawr Ave., Suite 1300, Chicago, IL 60631 Chicago, Illinois.

3.     On information and belief, Defendant Backbase Services USA, Inc. is a Delaware corporation with its principal place of business at 10 10th Street, Suite 325, Atlanta, Georgia, 30309.

4.     On information and belief, Defendant Backbase U.S.A, Inc. is a Delaware corporation with its principal place of business at 10 10th Street, Suite 325, Atlanta, Georgia, 30309.

## JURISDICTION AND VENUE

5.     Jurisdiction of this Court is proper under 28 U.S.C. 1332(a)(2).  This matter

involves citizens from the state of Indiana and citizens of the state of Georgia, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.      Further, venue is proper within this Judicial District under 28 U.S.C. 1391(a) and (c).  The claims in this case involve a contract between the parties in which they consented to the personal jurisdiction of the state and federal courts located in New York, New York, and agreed that all causes of action arising out of the contract or the relationship of the parties shall be governed by and construed under the law of the state of New York.

## RELEVANT FACTS

### A.  First Midwest's Business and Software Requirements

7.      First Midwest was a relationship-focused financial institution and, based on approximately twenty-one ($21) billion dollars of assets, whose parent corporation, First Midwest Bancorp, Inc.,  was one of the largest independently publicly traded bank holding companies in the United States.  It provided, and Old National continues to provide, a full range of commercial, treasury management, equipment leasing, consumer, wealth management, trust and private banking products and services.

8.      Since 1991, First Midwest ran its banking business on the following legacy software systems: (i) Strategic Transaction Resources ("Star"); and (ii) because of Defendants' failures, Old National is still running, its banking business on two separate legacy Enterprise Resource Planning[3] ("ERP") software systems.

9.      Specifically, First Midwest utilized a 30-year-old in-house designed ERP

---

[3] The software used by manufacturing and distribution companies to address their many varied needs is known as Enterprise Resource Planning Software.  It consists of numerous software applications or "modules" designed to perform a variety of tasks including, without limitation, financial accounting, distribution, planning, inventory control, and warehouse management.

system called Strategic Transaction Resources "Star" to run its branch banking system (the "Legacy Branch Software System"). First Midwest also utilized two outdated ERP systems, D1 and OAC, provided by FIS to run its online deposit system (the "Legacy Online System," and sometimes collectively with the Legacy Branch Software System, the "Legacy Software Systems").

10.   The Legacy Software Systems provided First Midwest with basic functionality, but they were outdated and could no longer fully support First Midwest's business processes, meet First Midwest's business requirements, or serve the needs and demands of First Midwest's customers.

11.   Moreover, the Legacy Software Systems had become difficult to support because they were at the end of their life, and First Midwest was having issues finding professionals that could support them.

12.   At a minimum, First Midwest required a new software system that could replace its bifurcated Legacy Software Systems and support both account acquisition and account servicing in compliance with United States banking regulations and other applicable laws.

**B.   First Midwest Begins Searching for a Replacement Software Solution**

13.   In 2019, First Midwest began investigating potential software providers to help sustain and better support its business. However, First Midwest was unfamiliar with available software platforms.

14.   To ensure it was following software evaluation and software selection best practices, it hired Price Waterhouse Coopers ("PWC") to assist it in finding a suitable replacement for the Legacy Software Systems.

15.   Over several months, PWC conducted workshops to help First Midwest

determine its functional needs and requirements for a new ERP system.  PWC helped First Midwest create an exhaustive and unambiguous list of requirements, which culminated in a Request for Information ("RFI") (A true and accurate copy of which is attached as Exhibit A).

16.     On or about October 31, 2019, PWC issued, on First Midwest's behalf, the RFI to approximately twenty ERP software system manufacturers.  The RFI specified the unique aspects of First Midwest's business, identified its requirements, and sought answers as to how potential software vendors could implement a system that would meet First Midwest's functional and non-functional business requirements.

17.     Based on the vendors' responses, First Midwest narrowed candidates down to four, one of which was Backbase.

### C. Backbase's Business and Pre-contract Misrepresentations to First Midwest

18.     Beginning with its first contacts with Backbase in 2019, and continuing throughout its contractual discussions with Backbase personnel through 2020, and up to the signing of the Agreement (as that term is defined below) in 2021, First Midwest relied on express representations made by Backbase in sales meetings, product demonstrations and in materials published by Backbase and provided to First Midwest, including those express representations described in paragraphs 21, 22, 23, 24, 30, 32, 33, 34, 35, 36, 37, 38, 44, and 46 below. Specifically, these representations included, but were not limited to the following: (i) Backbase fully understood First Midwest's business and its functional and nonfunctional requirements; (ii) that the Backbase Software met those requirements; (iii) that the Backbase Software was suitable for First Midwest's business; and (iv) that Backbase had consultants with the requisite experience, expertise and knowledge to implement and design a banking software system to meet First Midwest's business and functional and nonfunctional requirements.

19.    Backbase holds itself out as an international "omni-channel banking platform that provides capabilities for account opening, branch servicing, and online/mobile banking through a modern architecture and widget based design."

20.    Backbase further touts its software as being capable of unifying "data and functionality from traditional core systems and new FinTech players into a seamless digital customer experience."

21.    On or about November 21, 2019, Backbase responded to the RFI (the "RFI Response").  In the RFI Response, Backbase unequivocally represented that its software solution met each of First Midwest's business requirements and that its consultants and personnel had the requisite experience and expertise to implement a fully functional system that would address First Midwest's need for a system that could handle both account acquisition and account servicing while complying with United States banking regulations. Backbase further promised that it could design and implement the Backbase Software in six months.  A true and correct copy of the RFI Response is attached as Exhibit B.

22.    Also, in the RFI Response, Backbase stated that it has "developed out-of-the-box digital banking solutions optimized for retail banking, commercial banking, wealth management and insurance-specific scenarios."

23.    Backbase represented that these out-of-the-box solutions would "dramatically decrease . . . time to market by leveraging industry best practices and [a] ready-to-go implementation accelerator."

24.    In connection with the RFI Response, Backbase represented that the Backbase Software "allows customers, system integrators, solution providers, developers, analysts and independent software vendors to customize, extend, integrate, and develop innovative solutions

that allow [their] customers and partners to dominate their competition."

25.     In  further  communications  with  First  Midwest,  Backbase's  sales  and professional services teams reiterated these representations by phone, in-person, and through product demonstrations as detailed below.

### D.  The Software Demonstration

26.     On December 10, 2019, Backbase demonstrated the Backbase software solution to First Midwest.

27.     In  attendance  from  Backbase  were  Sales  Representative,  Jonathan  Noble, Backbase Head of Engineers, Wes Schiel, Backbase Vice President, Vincent Bezemer, Greg MacMillan and Duffy Walsh.

28.     Brian O'Meara, Cheri Rubocki, Diane Cirrencione, Thomas Prame, and Vinod Sisodiya attended for First Midwest.

29.     During  the  product  demonstration,  Noble,  Bezemer,  MacMillan  and  Walsh showed First Midwest what appeared to be a fully functioning software product that integrated both client-facing account opening and account management systems.

30.     Mr. Bezemer stated in the demonstration that "everything you are going to see is real software on real servers bringing it to real word.  It's all real.  There are no mock-ups here." Unknown to First Midwest, this was not true.  The demonstration was a high-tech parlor trick with Backbase largely demonstrating vaporware.

31.     During  the  product  demonstration,  Noble,  Bezemer,  MacMillan  and  Walsh demonstrated a software solution that supposedly had fully functioning reporting capabilities.

32.     They demonstrated how the Backbase Software's sales pipeline looked, and they demonstrated a "heat map" that showed, among other things, how many accounts were opened on

any given day.

33.     According to Noble and Bezemer, this functionality was fully developed and would enable expanded visibility across First Midwest's sales funnel.

34.     Not only did Noble and Bezemer demonstrate what appeared to be working out-of-the-box functionality, they repeatedly assured First Midwest that what they were demonstrating was built and ready to implement.  They stated, "[e]arlier in the relationship we showed you a couple of prototypes. We sent you a bunch of prototypes.  This stuff is all working. You can see the URL. This is actually a server. This is something that if you hire us we can put into production."  Unknown to First Midwest, this was a blatant misrepresentation.

35.     In fact, much of the functionality shown during the product demonstration had not yet been developed.  The out-of-the-box functionality that Backbase had shown to First Midwest simply did not exist.  Moreover, it could not be replicated in a production environment.

36.     For example, the software had no "heatmap" or reporting capabilities.  Contrary to Backbase's assertion otherwise, Backbase needed to build the functionality during implementation.  In fact, the "heatmap" and reporting capability was so far from being out-of-the-box that First Midwest's internal team had to show Backbase how to use Google analytics to provide any reporting capability at all.

37.     Similarly, Backbase represented that the software had out-of-the-box "fast fill" functionality that would take data from customers' drivers' licenses and populate forms.  In reality, the "fast fill" functionality shown during the demonstration was nothing but a ruse.  Backbase could never get it to reliably work in a production environment.

38.     Backbase's sales representatives further represented that Backbase had extensive experience in both account opening and account servicing and that Backbase had a deep

understanding of the regulatory requirements applicable to United States financial institutions.

39.     The aforementioned misrepresentations during the demonstration were all contrary to Bezemer's assurances that"[w]e are not here to push a round peg through a square hole. If the answer is no we will communicate a no.  You have our commitment we won't oversell.  That we won't sprinkle pixie dust.  It is just what it is."  Unfortunately, and as detailed below, this is exactly what Backbase did.

40.     Backbase's lack of knowledge regarding United States banking regulations was contrary to representations Backbase's consulting team, in various pre-contract meetings with First Midwest conducted in connection the Inception Statement of Work entered into by the parties on October 5, 2020.

### E. The Inception Statement of Work

41.     In narrowing its search to Backbase, First Midwest relied on Backbase's sales material, Backbase's representations about its capabilities, as well as the RFI Response.

42.     Before entering into the Agreement with Backbase, however, First Midwest wanted to ensure that Backbase fully understood the functional requirements for the needed software. In connection with the foregoing, First Midwest and Backbase entered into an "Inception Statement of Work" (a true and accurate copy of which is attached Exhibit C) on October 5, 2020 – approximately two months before the parties entered into the Agreement.

43.     Under the Inception Statement of Work, Backbase's consultants and representatives including, Michael Hosch, Greg Newell, Ralph Goodwin, Suneet Kaur, Douglas Stracner, Lashay Sowell, Arpitha Padidham, and Jonathan Noble conducted a series of workshops and analysis on October, 14, 2020, October 15, 2020, October, 27, 2020, November 2, 2020, November 3, 2020, November 4, 2020, November 5, 2020 and November 10, 2020, to review First

Midwest's business and functionality requirements, business processes and technology needs. In attendance from First Midwest were JoAnn Boylan, Brian O'Meara, Cheri Rubocki, Diane Cirrencione, Thomas Prame, Vinod Sisodiya, Kathy Latif, Salena Fuoss, Nabil Aramouni, and Ajinth Sreedharan.

44.    In those workshops, Backbase was unequivocal that the Backbase Software contained out-of-the-box functionality to enable First Midwest to accomplish its business requirements and business processes in compliance with regulatory requirements applicable to United States financial institutions.

45.    Over a period of five-weeks, First Midwest provided extensive information to Backbase concerning four main working areas: (i) business, (ii) technology, (iii) design, and (iv) process so that Backbase could scope the software project and ensure that it could meet First Midwest's functional and non-functional requirements.

46.    During the workshops, Backbase represented that it understood each of First Midwest's requirements and that it was fully aware that a timely and successful software implementation addressing each of First Midwest's business requirements and functional and non-functional requirements was critical to First Midwest's strategic business plan.

47.    First Midwest paid Backbase approximately, $156,720 for the Inception Statement of Work.

### F. First Midwest executes the Agreement with Backbase.

48.    In good faith reliance on Backbase's representations as to the suitability of the Backbase Software for First Midwest's banking processes, Backbase's purported skills and experience, Backbase's promised performance, and the representations described in Paragraphs 21, 22, 23, 24, 30, 32, 33, 34, 35, 36, 37, 38, 44, and 46 above, First Midwest signed the following

agreements with Backbase:  End User License Agreement dated January 1, 2021 (the "EULA"); (ii) Professional Services Agreement dated December 31, 2020 (the "PSA");and (iii) Product Order Form dated January 1, 2021 (the "Product Order," and sometimes collectively with the EULA and the PSA, the "Agreement").  True and accurate copies of the EULA, the PSA, its Statements of Work, and the Product Order are attached hereto as Exhibits D, E, F, and G, respectively.

49.    Under the Agreement, First Midwest hired Backbase to implement and design the Backbase software solution and to provide software subscription services under the EULA.

50.    In the Agreement, Backbase warranted to First Midwest that the Backbase Software would substantially perform in accordance with the Documentation  for a period of 270 days from the date of first delivery. [4]

51.    Backbase further warranted and represented in the Agreement that it would carry out its obligations under the Agreement in accordance with Good Industry Practice and that it would use only technically competent and properly trained and experienced staff to perform its obligations. [5]

### G.    Backbase Breaches the Agreement and Attempts to Extract Millions More in Fees From First Midwest.

52.    Once First Midwest entered into the Agreement, Backbase attempted to implement its software.

---

[4] The term "Documentation" is defined in the EULA as standard documentation regarding the Software or Services and use thereof, which accompanies the Software as a readme file or is made available by Backbase on the Extranet and may be updated by Backbase from time to time.

[5] The term "Good Industry Practice" is defined in the PSA to mean "that the Services will be performed in an efficient, effective, reliable, professional and safe manner and with the standard of skill, care, knowledge and foresight which would reasonably and ordinarily be expected from an experienced person engaged in providing services which are the same as, or similar to, the Services.

53.    The implementation was an unmitigated failure.

54.    Contrary to Backbase's representations and promises, the Backbase Software contained virtually no out-of-the-box functionality. Instead, Backbase had to build functionality from scratch, and often times it could not even do just that.

55.    This "from scratch" build included, but was not limited to, collaboration tools, compliance with United States banking regulations, Core Functionality, Document Management functionality, Omni Channel Application Functionality, Onboarding & Fulfillment Functionality, and Qualifications & Approval Functionality.

56.    Similarly, Backbase failed to deliver a staggering number of the First Midwest's business requirements – at least 161 – many of which Backbase represented as being included as out-of-the-box functionality, which they were not.  A list of those failed business requirements is attached as Exhibit H.  This was after First Midwest had dramatically reduced the scope of the Project and paired down its requirements to a minimally viable product.

57.    Even with a dramatically reduced scope and reduced requirements, which First Midwest was forced to allow based upon reasons discussed below, Backbase was only able to deliver approximately 53% of the functionality it had agreed to deliver.

58.    Moreover, the software that Backbase did deliver had at least 139 unresolved defects.

59.    In an attempt to utilize the Backbase Software, First Midwest had to develop 34 manual processes just to get a new account into the First Midwest system.  This was despite Backbase selling First Midwest what was supposed to be a fully integrated account acquisition and accounting servicing software solution.

60.    Backbase, contrary to its representations, either had no understanding of United

States Banking regulations, or failed to assign consultants with the necessary experience or competence to design and implement the software in compliance with those regulations.

61.    By way of example, the Backbase Software was unable to properly display an interest rate and annual percentage yield—which is a statutory and regulatory requirement—to a customer utilizing the software's digital sales tool to open a Certificate of Deposit.

62.    In addition, opening a qualified account requires identification of beneficiaries and, in certain cases, confirming a spouse's waiver if the spouse is not identified as the beneficiary, another legal requirement.  The Backbase Software could not meet these requirements.

63.    By way of further example, the Backbase Software was unable to display disclosures to customers throughout the account opening process. The Backbase Software could not allow customers to consistently view, print and download disclosures as required by applicable law.

64.    All of the foregoing were critical requirements without which First Midwest could not comply with applicable law and regulations.

**H.    Backbase Misrepresents The True Status of The Project And Falsifies User Acceptance Testing Results**

65.    Backbase's failure to implement the Backbase Software in compliance with its contractual obligations resulted in numerous delays to the Project.  Backbase had originally committed to complete the Project within 6 months of the date of the Agreement.  Because of its failures, the Project was consistently delayed with Backbase missing go-live dates in July, 2021, September, 2021, November, 2021, December 2021, February, 2022, and April 2022.

66.    During the Project, Backbase provided First Midwest with project status reports that consistently misidentified the "health" or status of the Project as "green," thereby hiding the true status of the Project from First Midwest, and intentionally depriving it of the opportunity to decide

whether it wanted to devote more resources to the Project, pause the Project, or terminate the Project.

67.     Backbase consistently identified deliverables that had been previously rejected by First Midwest as accepted in an attempt to move on to other deliverables and meet Project deadlines. First Midwest had no choice but to temporarily abandon the unworkable deliverables and work with other deliverables so that it could get some semblance and idea of whether the Backbase Software could actually perform and deliver.

68.     Because of Backbase's unfamiliarity with United States banking requirements and its inability to deliver agreed upon functionality in compliance with United States banking regulations, First Midwest had to divert its project team's time and resources away from the Project to try to educate Backbase.

69.     By way of example, Backbase had a total lack of understanding of account titling. Backbase could not comprehend the concept of a joint account, individual account, or corporate account.  Instead of identifying accounts as one banking product, Backbase designed the software so that it treated each account as an entirely separate product category.  As a result, an authorized signatory on an account was unable to add an additional signatory.

70.     Backbase's industry knowledge was so limited that it had failed to scope for common consumer banking products including, but not limited to, minor/custodian accounts, guardianships. executor trusts, and IRAs.

71.     This meant that if First Midwest used the Backbase Software, First Midwest would be unable to offer standard consumer banking products to its customers without expanding the scope of the Project and paying additional money to Backbase.

72.     Similarly, Backbase was unfamiliar with the concept of a Health Savings Account ("HSA") and how it worked.  In an attempt to get Backbase to provide a software solution that would

14

allow First Midwest to offer HSAs to its customers, First Midwest was forced to draft a 5-page synopsis on how HSAs worked to Backbase in an effort to educate Backbase on the fundamentals of the account.

73.     Even with First Midwest's continual efforts to educate Backbase so that it could deliver a workable software solution, Backbase still failed to deliver anything close to that.

74.     Backbase had no workable solution for enabling in-branch bankers to service customers or assist customers in opening accounts using the Backbase Software. Backbase's solution was to essentially convert each of First Midwest's branches into self-service banking centers where in-branch bankers would direct customers to the internet to open new accounts on Ipads handed out to each customer that walked into the branch.

75.     Backbase was never able to provide "out-of-the-box" functionality that would allow new customers to utilize debit cards to fund newly-opened accounts. Backbase's proposed workaround was for First Midwest to eliminate card based funding for new accounts all together.

76.     Backbase could never enable required disclosure presentation to work in any consistent manner on the most commonly used browsers such as Internet Explorer, MS Edge and Safari for IPhone/Ipad.MAC devices. This inconsistency meant that if the Project was deployed to production, the bank would not be regulatory compliant. While disclosures would sometimes appear, they usually did not.

77.     Backbase's consultants had no dedication or commitment to deliver a functioning software solution to First Midwest.

### I.  In an Attempt to Reset, Backbase And First Midwest Enter Into a Second Statement of Work Dated July 29, 2021

78.     On July 29, 2021, Backbase and First Midwest entered into a second Statement of Work ("SOW 2"). Despite Backbase's numerous failures, First Midwest clung onto the hope that

Backbase could deliver what it had promised – an industry leading solution that no other bank had.

79.    Under SOW 2, First Midwest agreed to push out delivery deadlines to accommodate Backbase so that the prior six months' worth of time would not be for nothing.

80.    In addition, First Midwest drastically de-scoped the Project to accommodate Backbase's limitations and inability to deliver functionality.  First Midwest reduced or eliminated key requirements for the Backbase Software, and drastically pared down what it would accept as a minimally viable product.

81.    Even with the pushed out delivery deadlines and reduced Project scope, Backbase still struggled.  Backbase continued to miss key delivery milestones and requirements, and the Project continued to be delayed.

### J. First Midwest Sends A Formal Breach of Warranty Notice to Backbase

82.    Concerned with the continued delays caused by Backbase's failures, lack of experience, and multiple breaches, First Midwest's Vinod Sisodiya emailed Backbase on September 28, 2021, timely notifying Backbase of First Midwest's claim under the warranty in the Agreement.  But, in a good faith attempt to give Backbase additional time to deliver a workable software solution, First Midwest asked Backbase to extend the warranty deadline although it was not required to do so.

83.    Not only did Backbase refuse to extend the warranty deadline, it refused to honor its warranty obligations at all.  Backbase argued that First Midwest had failed to provide enough detail to make a viable warranty claim, though no such obligation existed in the Agreement.

84.    Despite Backbase's refusal to honor its warranty obligations, First Midwest continued to work with Backbase in good faith so that it could obtain a minimally viable product.

85.    Despite First Midwest's good faith efforts, Backbase replaced key developer

resources and business analysts assigned to the Project without any notification to First Midwest. In one instance, First Midwest continued to send communications to a key business analyst, unaware he had been removed.

86.     Backbase provided First Midwest with inexperienced consultants and personnel. It re-assigned key consultants to more lucrative, or important accounts.  In July 2021, Backbase replaced the project manager assigned to the First Midwest Project.

87.     With little knowledge transfer between the replaced Backbase personnel, Backbase changed its software development methodology.  In fact, Backbase even abandoned the agile cadence of the software development sprints.

88.     While First Midwest could see that code had been written, it was unable to see if the functionality worked.  Despite this, Backbase pushed code into the production environment at the same time it was pushing code into the testing environment.  Backbase assured First Midwest that even if the functionality did not work in a testing environment, it would work in a production environment.  Unknown to First Midwest, this was false.

89.     When functionality was ready for user acceptance testing, Backbase failed to provide any requirements with which to measure the functionality it delivered.

90.     Backbase failed to provide any transparency into what functionality it was building and what requirements it was using for the build.

91.     Project Status Reports were no longer transparent.  They all painted a false view of the status of the Project.  For example, the Project Status Reports would identify the status of the Project as "green" or "healthy," but then within days the status would inexplicably change to "red."

### K. The Merger

92.     On June 1, 2021, First Midwest Bancorp, Inc. and Old National Bancorp publicly

17

announced the Merger.  As part of that announcement, Old National made clear it was excited to merge with First Midwest.  One of the many exciting concepts of the Merger expressed by Old National was to be able to use the Backbase Software that First Midwest had been trying to implement.  Old National was without question on board with continuing the relationship with Backbase.

93.     On February 15, 2022, First Midwest Bancorp, Inc., merged into Old National Bancorp.  On February 16, 2022, First Midwest merged into Old National   As a result of the Merger, Old National succeeded to First Midwest's interest in the Agreement.

94.     Immediately upon learning of the implementation of the Backbase Software at First Midwest, Old National made it known to both Backbase and the public that it was eager to continue the Backbase Software implementation after the Merger and embraced the Project.

95.     Old National issued various press releases in which it announced to the public that it was excited to move ahead with the relationship.  For example, on June 1, 2021, when the Merger was first announced, Old National and First Midwest jointly stated that digital and technological capabilities at the banks were part of the strategic benefits of the Merger, and that "[t]he combined organization creates the scale and profitability to accelerate digital and technology capabilities to drive future investments in consumer, wealth management and commercial banking services."[6]

96.     The Merger unequivocally did not change the nature of the Backbase Software implementation.

97.     Moreover, Old National made no changes to any requirements associated with

---

[6] See https://ir.oldnational.com/news-events/press-releases-news/news-details/2021/Old-National-and-First-Midwest-Announce-Merger-to-Create-a-Premier-Midwestern-Bank/default.asp.

the Project, apart from a change in the bank's logo, which was a simple JPEG switch, and the bank name on the disclosure displayed to customers.

98.     The only substantive impact that the Merger had on the implementation was that the Backbase Software's backend would hook into the Old National core technology stack instead of First Midwest's.   This would be accomplished with application programming interfaces ("APIs").[7]  The difference in the core technology stack was neither material to the Project or time-consuming.

**L. Old National's Attempts to Get the Project Back on Track**

99.     Old National worked in good faith with Backbase to identify and resolve issues in a determined effort to launch the Backbase Software.

100.    As part of the integration of the two banks, Old National became more involved with the First Midwest team that was working with Backbase on the Project.

101.    Despite Old National's efforts, Backbase repeatedly missed and re-planned delivery of the Backbase Software.  In February, 2022, Old National's CIO, Paul Kilroy, reached out to the CEO of Backbase, Jouk Pleiter, after yet another missed deadline by Backbase.  Mr. Kilroy advised Mr. Pleiter that the Project was stalling.  In response, Mr. Pleiter assured Mr. Kilroy that Backbase would do great things for Old National, and that Backbase would assign the best Backbase personnel to the Project.  Despite Mr. Pleiter's assurances, nothing changed.

102.    In a follow-up meeting in May, 2022, Mr. Pleiter candidly admitted Backbase

---

[7] An API, or application program interface, is a way for computers to talk to each other.  An application programming interface connects computers or pieces of software to each other.  It is not intended to be used directly by a person other than a computer programmer who is incorporating it into the software. One purpose of APIs is to hide the internal details of how a system works, exposing only those parts a programmer will find useful and keeping them consistent even if the internal details later change. An API may be custom-built for a particular pair of systems, or it may be a shared standard allowing interoperability among many systems.

had let Old National down.  In that same meeting, Backbase admitted that Backbase's agile software development process had been flawed, and that Backbase lacked financial services experience.

103.   Despite these failings, Backbase assured Old National that Backbase would deliver "immediate value."

104.   Backbase's delivery of "immediate value," it turned out, was far from immediate.  Rather, it would require Old National to pay an additional three million dollars to Backbase and take fourteen more months to complete.

105.   The estimate of fourteen months was assuming there were no additional delays, when historically the Project was riddled with delay after delay.  It also required Old National to take a leap of faith to trust that Backbase could now finally deliver value when it had repeatedly not done so before.

106.   Backbase's promise to deliver immediate value was belied by its requests that Old National give it more time, patience, and above all money, to implement a system that should have been delivered long ago.

107.   At this point, it was more than clear that Backbase simply did not have the ability or expertise to finish the Project, despite the substantially reduced scope which First Midwest had only done in order to accommodate Backbase's inability to deliver as originally promised.

108.   Despite Backbase's rejection of the warranty claim, at least 139 substantive issues remained outstanding – many of which Backbase had represented as out-of-the-box.

109.   Similarly, Backbase had only fulfilled approximately 53% of the requirements listed in SOW 2.

110.   Despite repeated and continued efforts by First Midwest and then Old National to

make the Project work and find immediate value, it was apparent that Backbase could not deliver.

111.   Backbase's constant push for more time, and more money was never going to change, and the only real solution was to part ways because of Backbase's repeated failures, misrepresentations and breaches.

## FIRST CAUSE OF ACTION
### (Fraudulent Inducement)

112.   Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

113.   In the numerous advertisements, website postings, press releases, meetings, the RFI Response and demonstrations detailed above in paragraphs 21, 22, 23, 24, 30, 32, 33, 34, 35, 36, 37, 38, 44, and 46 (collectively referred to herein as the "Misrepresentations"), Backbase, through its agents, including, but not limited to, Wes Schiel, Jonathan Noble, Vincent Bezemer, Greg MacMillan, Duffy Walsh, Michael Hosch, Greg Newell, Ralph Goodwin, Suneet Kaur, Douglas Stracner, Lashay Sowell, Arpitha Padidham (the "Backbase Agents"), represented to First Midwest that the Backbase Software had out-of-the box, capability and functionality that meet First Midwest's specific banking and regulatory needs, and addressed First Midwest's business processes. The Backbase Agents further represented that they would implement the Backbase Software within six months from the execution of the Agreement.

114.   Specifically, the Backbase Agents during the December 10, 2019 software demonstration specifically represented that the Backbase Software shown to First Midwest was "real software on real servers bringing it to real word.  It's all real.  There are no mock-ups here." At the time the Backbase Agents made these representations, these representations were false, and known by Backbase to be false.

115.   During the December 10, 2019 software demonstration, and in workshops

21

conducted by the Backbase Agents on October14, 2020, October 15, 2020, October, 27 2020, November 2, 2020, November 3, 2020, November 4, 2020, November 5, 2020 and November 10, 2020, the Backbase Agents represented that the Backbase Software contained out-of-the-box functionality to enable First Midwest to accomplish its business requirements and business processing in compliance with regulatory requirements applicable to United States financial institutions.

116.    Backbase's representations to First Midwest were material to First Midwest's decision to enter into the Agreement with Backbase.

117.    At the time Backbase made the representations to First Midwest, Backbase knew, that the Backbase Software did not possess those capabilities, making Backbase's representations false, and/or made the representations with a reckless disregard for whether they were true or false.

118.    Backbase intended that First Midwest would rely on those representations and induced First Midwest to rely on them.

119.    Backbase knew, or should have known, that it could not achieve complete implementation of the Backbase software and other deliverables under the Agreement within six months, if ever.

120.    Backbase further knew, or should have known, that the Backbase Software and other deliverables were incapable of performing as represented to First Midwest and, therefore, had knowledge of the falsity of its representations.

121.    Backbase had superior knowledge of its software's capabilities and First Midwest was without knowledge of whether the software Backbase agreed to configure, modify, and implement would perform as represented or could be fully implemented within six months of

execution of the Agreement.

122.   Due to Backbase's superior knowledge of its software's capabilities, First Midwest reasonably relied on Backbase's representations and did, in fact, rely on Backbase's representations.

123.   Backbase's representations to First Midwest were false and concerned a present or preexisting fact, namely – the capabilities of the software and Backbase's ability to timely implement the software at First Midwest, provide software that was capable of complying with statutory regulations, and Backbase's experience, expertise and understanding of United States banking regulations.

124.   Backbase knew that First Midwest would rely on its superior knowledge of its software's capabilities and its ability to completely implement the regulatory-compliant software within the promised six months, and intended to deceive First Midwest in order to induce First Midwest to enter into its agreements with Backbase.

125.   As a direct and proximate result of First Midwest's justifiable reliance on Backbase's false representations by entering into the Agreement with Backbase and continuing its relationship with Backbase, Old National has been damaged and is entitled to an award of actual, consequential, and punitive damages.

**WHEREFORE**, Old National demands judgment against Backbase on the First Cause of Action for:

a.     rescission of the contract between Old National and Backbase; and

b.     restitution of all amounts obtained by Backbase from Old National.

c.     damages in an amount to be determined at trial;

d.     pre-judgment interest;

 e. post-judgment interest;

 f. court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law and/or the parties' agreement; and

 g. such other and further relief that the Court deems just.

## SECOND CAUSE OF ACTION
### (Fraudulent Misrepresentation)

126. Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

127. In the Misrepresentations through the Backbase Agents, Backbase represented to First Midwest that Backbase had an out-of-the-box banking software system, with specific capability and functionality to meet First Midwest's banking needs and requirements, including regulatory compliance.

128. At the time the Backbase's Agents made these representations, these representations were false, and known by Backbase to be false.

129. Backbase and the Backbase Agents made the Misrepresentations with the specific intent that First Midwest would rely on them to cause and induce First Midwest to purchase software products and services from Backbase.

130. The Backbase Agents during the December 10, 2019 software demonstration specifically represented that the Backbase Software shown to First Midwest was "real software on real servers bringing it to real word.  It's all real.  There are no mock-ups here."  At the time the Backbase Agents made these representations, these representations were false, and known by Backbase to be false.

131. The Backbase Agents during the December 10, 2019 software demonstration further represented that Backbase had extensive experience in both account opening and account servicing and that Backbase had a deep understanding of the regulatory requirements applicable to

United States financial institutions.  At the time the Backbase's Agents made these representations, these representations were false, and known by Backbase to be false.

132.   The Backbase Agents during the December 10, 2019 software demonstration represented that the software had out-of-the-box "fast fill" functionality that would take data from customers' drivers' licenses and populate forms.  At the time the Backbase's Agents made these representations, these representations were false, and known by Backbase to be false.

133.   During the December 10, 2019 software demonstration, and in workshops conducted by the Backbase Agents on October14, 2020, October 15, 2020, October 27, 2020, November 2, 2020, November 3, 2020, November 4, 2020, November 5, 2020 and November 10, 2020, the Backbase Agents represented that the Backbase Software contained out-of-the-box functionality to enable First Midwest to accomplish its business requirements and business processing in compliance with regulatory requirements applicable to United States financial institutions.

134.   Based on Backbase's alleged superior knowledge of its software, the software's purported out-of-the-box capabilities, the purported ability for the software to meet regulatory requirements, and Backbase's supposed extensive experience in both account opening and account servicing, First Midwest, reasonably and justifiably relied on the Misrepresentations by entering into the Agreement with Backbase and continuing its relationship with Backbase.

135.   First Midwest's reliance was reasonable in light of Backbase's professed knowledge of banking capabilities and regulations, its professed experience, the Backbase Software's purported out-of-the-box capabilities, and First Midwest's specific requirements.

136.   Backbase's representations were false.  The services and products First Midwest purchased from Backbase were not only non-compliant with regulatory banking standards; they

were also not functional nor useable by First Midwest.

137.   First Midwest paid Backbase substantial sums of money for the software and associated services.

138.   First Midwest did not receive any value or benefit in exchange for those payments.

139.   As a further result of the Misrepresentations, First Midwest has sustained a loss of profits, a loss of business growth, and a loss of new account openings with its current and prospective customers, from January 2021 to the present and continuing.

140.   First Midwest, and then Old National, was forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause Backbase to deliver a regulatory-compliant banking software solution that was usable to its customers and employees.

141.   As a direct and proximate result of First Midwest's justifiable reliance on Backbase's false representations, by entering into the Agreement and continuing its relationship with Backbase, Old National has been damaged and is entitled to an award of actual, consequential, and punitive damages.

**WHEREFORE**, Old National demands judgment against Backbase on the Second Cause of Action for:

a.   damages in an amount to be determined at trial;

b.   pre-judgment interest;

c.   post-judgment interest;

d.   court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law and/or the parties' agreement; and

e.   such other and further relief that the Court deems just.

### THIRD CAUSE OF ACTION

**(Violation of The Illinois Consumer Fraud and Deceptive Businesses Practices Act
815 ILCS 505/01, *et. seq*.)**

142.     Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

143.     The Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/01, *et. seq*. applies to the sales of goods and services situated outside the State of Illinois.

144.     Backbase qualifies as a "person" under 815 ILCS 505/1.

145.     Old National qualifies as a "consumer" under 815 ILCS 505/1.

146.     Under the Illinois Consumer Fraud and Deceptive Business Practices Act, it is unlawful for any person or corporation or company to employ or use any act of deception whether or not any person has in fact been misled, deceived or damaged thereby.

147.     Backbase employed unfair and deceptive acts and practices when it demonstrated the Backbase Software to First Midwest,

148.     Backbase employed unfair and deceptive acts and practices when the Backbase Agents made the Misrepresentations.

149.     Backbase employed unfair and deceptive acts and practices when it misrepresented the true status of the project and falsified user acceptance testing results.

150.     Backbase intended for First Midwest to rely on its deception as evidenced by First Midwest entering into the Agreement.

151.     Backbase's unfair and deceptive acts and practices occurred in the regular course of Backbase's business.

152.     The unfair and deceptive acts and practices employed by Backbase were outrageous and performed with reckless indifference towards the rights of First Midwest and Old National and thus, they have been damaged by Backbase's actions.

27

**WHEREFORE,** Old National demands judgment against Backbase on the Third Cause of Action for:

      a.    damages in an amount to be determined at trial;

      b.    pre-judgment interest;

      c.    post-judgment interest;

      d.    court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law and/or the parties' agreement; and

      e.    such other and further relief that the Court deems just.

**FOURTH CAUSE OF ACTION**
**(Violation of New York General Business Law, § 349, In the Alternative)**

153.   Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

154.   New York General Business Law Section 349 (("GBL 349") declares "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state…."

155.   Also, any violation of GBL 49 allows a plaintiff to enjoin such unlawful acts or practices and to recover actual damages.

156.   As a direct, foreseeable, and proximate result of Backbase's unlawful and/or unfair and/or fraudulent business practices, First Midwest has suffered and continues to suffer damages.

157.   First Midwest is entitled to a restitution order or judgment as may be necessary to prevent the use or employment by Backbase of those practices which constitute unfair competition and as may be necessary to restore to First Midwest its money or property that Backbase retained.

**WHEREFORE**, Old National demands judgment against Backbase on the Fourth Cause of Action for:

        a.     damages in an amount to be determined at trial;

        b.     pre-judgment interest;

        c.     post-judgment interest;

        d.     court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law and/or the parties' agreement; and

        e.     such other and further relief that the Court deems just.

**FIFTH CAUSE OF ACTION**
**(Breach of Contract)**

158.   Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

159.   First Midwest entered into the Agreement with Backbase, whereby First Midwest agreed to pay Backbase certain sums of money in consideration for Backbase implementing a functional banking compliant ERP system for First Midwest's business.

160.   Backbase was contractually obligated to use commercially reasonable care and skill in implementing the Backbase software and addressing any issues with the services. Backbase was further contractually obligated to ensure each of its employees, consultants, and subcontractors had the necessary knowledge, skills, experience, qualifications, and resources to provide and perform the services.

161.   Backbase was also contractually obligated to perform and deliver the services to First Midwest in accordance with Good Industry Practice.

162.   First Midwest and Old National have performed and complied with all of their contractual obligations under the Agreement and are not in breach of the Agreement.

163.   Backbase failed to fulfill its obligations under the Agreement, which constitutes a material breach of the Agreement.

164.   Backbase breached the Agreement by providing non-functional software and deficient services.

165.   Backbase failed to properly configure and implement functional software, and failed to provide commercially reasonable care and skill in implementing and addressing First Midwest's issues with the Backbase Software and services.

166.   Backbase did not provide employees, consultants, and personnel who had the necessary knowledge, skills, experience, qualifications, and resources to provide and perform the services.  Backbase did not perform and deliver services to First Midwest in accordance with Good Industry Practice and it did not use technically competent and properly trained and experienced staff to perform its obligations.

167.   Because of Backbase's misconduct, errors, and failures, it breached the Agreement by providing deficient software that failed to perform in accordance with the Agreement.

168.   Backbase's breaches were material and not incidental in nature.

169.   Backbase's failings each constitute a material breach of the Agreement, including but not limited to Sections 4.2 and 8.11 of the EULA.

170.   Backbase's breach of the Agreement has caused significant damage to First Midwest's business.

171.   As a direct and proximate result of Backbase's breaches of the Agreement as described above, Old National has paid substantial sums of money for a purported software solution that is not capable of being used, and has caused Old National to lose substantial amounts

of money and to lose substantial amounts of business.

172.   As a direct and proximate result of Backbase's breaches of the Agreement, as described above, First Midwest and then Old National were forced to divert thousands of hours of employee time, and additional expenses, in a futile attempt to cause Backbase to deliver a software product that Backbase was not capable of providing.

173.   As a direct and proximate result of Backbase's breach of the Agreement, Old National is entitled to have the money it paid to Backbase restored to it, with interest, and, in addition, recover direct, special, incidental, and consequential damages.

**WHEREFORE**, Old National demands judgment against Backbase on the Fifth Cause of Action for:

a.   damages in an amount to be determined at trial;

b.   pre-judgment interest;

c.   post-judgment interest;

d.   court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law and/or the parties' agreement; and

e.   such other and further relief that the Court deems just.

**<u>SIXTH CAUSE OF ACTION</u>**
**<u>(Breach of Express Warranty)</u>**

174.   Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

175.   Backbase agreed pursuant to an express warranty contained in the Agreement that the Backbase Software would substantially perform in accordance with its Documentation (as that term is defined in the EULA) for a period of 270 days from the date of first delivery.

176.   Backbase further warranted and represented in the Agreement that it would carry out its obligations under the Agreement in accordance with Good Industry Practice and that it

31

would use only technically competent and properly trained and experienced staff to perform its obligations.

177.   Backbase breached the express warranties to First Midwest and then Old National.

178.   Despite First Midwest bringing to Backbase's attention its failure to comply with the express warranties contained in the Agreement, Backbase was either unwilling or unable to make the necessary changes to the software or its delivery of services to comply with its warranted obligations.  Backbase was unwilling to engage with First Midwest or Old National on finding a proper solution so that they could use the Backbase Software for modern banking needs. Backbase's unwillingness or inability to address these issues does not comport with the commercially reasonable care and skill as warranted expressly in the Agreement.

179.   This unwillingness or inability from Backbase to address these issues  constitutes a breach of the express warranty that it carry out its obligations under the Agreement in accordance with Good Industry Practice and use only technically competent and properly trained and experienced staff to perform its obligations.

180.   Backbase further breached the express warranties to First Midwest by failing to deliver software that substantially complied with the Documentation.

**WHEREFORE**, Old National demands judgment against Backbase on the Sixth Cause of Action for:

      a.      damages in an amount to be determined at trial;

      b.      pre-judgment interest;

      c.      post-judgment interest;

      d.      court costs and attorneys' fees incurred by Old National in prosecuting this action; and

e.     such other and further relief that the Court deems just.

### SEVENTH CAUSE OF ACTION
**(Unjust Enrichment, In the Alternative)**

181.   Old National incorporates the allegations in the preceding paragraphs as if fully set forth herein.

182.   Backbase promised First Midwest that it could deliver and install a software solution that would meet First Midwest's business and functional needs and comply with United States banking regulations.

183.   Backbase also promised First Midwest that it had extensive experience with First Midwest's industry and consultants, employees and personnel with a deep understanding of United States banking regulations.

184.   Backbase's promises induced First Midwest to pay approximately $7,500,000 to Backbase to obtain these services and software and millions more to third party vendors and service providers for software, hardware and services associated with the failed Backbase software implementation.

185.   Backbase has not provided the services or software it promised to First Midwest or Old National.

186.   As a result of Backbase's failure to provide these services and software, Backbase has become unjustly enriched at Old National's expense.

187.   It would be unjust and inequitable for Backbase to retain the monies paid by First Midwest for a software product that did not perform according to Backbase's promises.  Old National seeks a return of all monies paid to Backbase with interest.

**WHEREFORE**, Old National demands judgment against Backbase on the Seventh Cause of Action for:

      a.       damages in an amount to be determined at trial;

      b.       pre-judgment interest;

      c.       post-judgment interest;

      d.       court costs and attorneys' fees incurred by Old National in prosecuting this action, as provided by law; and

      e.       such other and further relief that the Court deems just.

Dated:  November 28, 2022            Respectfully submitted,

                                  s/ Marcus S. Harris
                                  Marcus Stephen Harris

                                  TAFT STETTINIUS & HOLLISTER LLP
                                  *Attorneys for First Midwest*
                                  111 East Wacker, Suite 2800
                                  Chicago, IL 60601
                                  (312) 840-4320
                                  mharris@taftlaw.com

                                  Stuart M. Riback
                                  Scott Watnik
                                  WILK AUSLANDER LLP
                                  *Attorneys for First Midwest*
                                  825 Eighth Avenue, Suite 2900
                                  New York, NY 10019